IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| TIRNELL WILLIAMS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| JOHN BALDWIN, | ) |
| KAREN JAIMET, | ) |
| CHRISTOPHER THOMPSON, | ) |
| CAROL McBRIDE, | ) Case No. 18-cv-0986-MJR-SCW |
| DR. BUTALID, | ) |
| JOHNNIE SMITH, | ) |
| KIM REEDER, | ) |
| CHRISTINE BROWN, | ) |
| ROBERT BLUM, | ) |
| NURSE ABBY, | ) |
| TYRON LOMAX (interested party) | ) |
| | ) |
| Defendants. | ) |

**MEMORANDUM & ORDER**

**REAGAN, Chief Judge:**

I. Introduction

Now before the Court is Magistrate Judge Stephen Williams' Report and Recommendation (R&R) on Plaintiff's Motion for a Preliminary Injunction (Docs. 2, 98). The underlying suit is a civil rights complaint by inmate Tirnell Williams against various individuals at Pinckneyville Correctional Center ("Pinckneyville") concerning the level of care he is receiving for his physical limitations (requiring a wheelchair), as well as his diabetes, and predisposition to seizures (Doc. 1). Williams originally sought

a mandatory injunction directing Pinckneyville to provide a variety of accommodations including accessible showers, an accessible bed and toilet, additional catheters, a waste disposal box (for used diapers), lubricant, surgical gloves, and access to certain medications. Magistrate Judge Williams held two evidentiary hearings on the matter, directing the IDOC to provide supplemental information after each hearing. After reviewing all the evidence, and accounting for IDOC's recent accommodations, Magistrate Judge Williams recommends denying the motion for preliminary injunction (Doc. 98). The parties had 14 days to file objections to the R&R—Plaintiff filed an objection (Doc. 100), a supplemental objection (Doc. 104), and a sealed motion for a second preliminary injunction (Doc. 112). The matter is now ripe for the undersigned's review.

II.  Facts

Plaintiff's complaint alleges that many individuals at Pinckneyville have participated in failing to provide him with adequate care and accommodations for his medical needs (Doc. 1). Plaintiff is unable to use his legs or his left arm, so he is limited to a wheelchair (*Id.*). He requires medical supplies including catheters, urine bags, diapers, sterile gloves, and lubricant to assist him in disposing of bodily waste. Upon arrival at Pinckneyville, he was completely unable to secure sterile gloves, and he is frequently required to re-use old supplies for bodily waste. Consequentially, he contracted a bladder infection.

After receiving a disciplinary infraction, he was moved to a segregation cell. The cell lacked appropriate grab bars for the toilet or bed, making it unsafe for him. The segregation showers also lacked appropriate facilities and he was not allowed to use the facilities to clean himself often enough.

In addition to his issues with the accommodations for personal hygiene and bodily waste, Plaintiff also alleged that he had problems receiving medications he needed to prevent seizures or treat diabetes. Medications for seizures were discontinued and medications for diabetes were not administered.

On June 6, 2018, Magistrate Judge Williams held the first of two evidentiary hearings on the motion for preliminary injunction (Doc. 76). Plaintiff testified that he wakes up soiled in his diapers but is only allowed to shower three times a week in the afternoon (*Id.* at 3-8). Additionally, he contends the shower in segregation is inadequate because there is only one grab bar, the chair is rickety, and he cannot properly reach the showerhead (*Id.* at 8-13). As far as bodily functions go, Plaintiff testified that he does not get a plastic bag to dispose of used catheters or diapers, causing his cell to smell (*Id.* at 13-15). He also complains that he does not get protective gloves, which would protect him from infection with a catheter and would also allow him to void his bowels manually (*Id.* at 15-17).

Regarding his medications, Plaintiff contends that Dr. Butalid discontinued his seizure medications after he was accused of hoarding them in his cell (*Id.* at 17-20). The

prison continues to offer him a temporary seizure medication—Lamictal—despite his statements that he no longer takes the medication (*Id.* at 20-21). Meanwhile, they discontinued other medications he needed (*Id.*). He had been on the seizure medication and his seizures had been well managed for eight years prior to being taken off the medication (*Id.* at 25-26).

Plaintiff has been paralyzed since 2011 (*Id.* at 21-26). He has spent time in and out of incarceral facilities since 2015 (*Id.*).

Finally, Plaintiff claimed that he needed a bed with guard rails to protect him from falling during a seizure or spasm in the night (*Id.* at 26-27).

At the conclusion of the first evidentiary hearing, Magistrate Judge Williams directed Defendants to secure a complete copy of Plaintiff's medical file (*Id.* at 28-29).

On July 17, 2018, Magistrate Judge Williams conducted a second evidentiary hearing in relation to Plaintiff's motion for a preliminary injunction (Doc. 103). The first witness was Karen Jaimet, former Warden of Pinckneyville. Jaimet did not know how often inmates in segregation were able to shower, but she did know it was less frequently than general population inmates (*Id.* at 4-10). Jaimet indicated that Pinckneyville was ADA compliant and provided necessary assistive devices to inmates in segregation (*Id.* at 8-10). She testified that in terms of specific ADA compliance, she only knows that the wheelchair accessible cells are larger than others (*Id.* at 12-13).

Christine Brown, a registered health care unit administrator at Pinckneyville, and the ADA coordinate, testified that she oversees medical services for inmates (*Id.* at 16-17). As to Pinckneyville's ADA cells, she testified in general population the cells have two low bed and two top bunks for aids, as well as handrails for the toilet (*Id.* at 18). The segregation cells are the same save for the top bunks (*Id.*). None of the cells at Pinckneyville have full bed rails because the rails are considered a safety hazard (*Id.* at 19).

Immediately upon learning that Plaintiff needed a different shower chair in segregation, Brown alleges that she had one sent over (*Id.* at 20-21). Plaintiff agreed and identified pictures that showed there was a new shower chair in segregation (*Id.* at 27-28). According to Brown, the shower chairs do not affix to the floor, but they do have rubber feet to prevent slipping (*Id.* at 31-32). The ADA shower in segregation also has a shower head on a hose (*Id.* at 32). To Brown's knowledge, the chair in the segregation shower is sufficient for Plaintiff's use (*Id.*).

As to the catheters and diapers, inmates are sent a set number when they take up residence at the facility, but they can request more from health care at any time in exchange for the used materials (*Id.* at 33-34). For hygiene reasons, a doctor can prescribe extra showers as well (*Id.* at 33-34).

Turning to medications, nurses dispense them each day (*Id.* at 34). When a refill is needed, the offender follows an established process to initiate the refill (*Id.* at 34-35).

If Brown becomes aware that an ADA inmate needs a different accommodation or extra supplies, she will ensure that it is taken care of (*Id.* at 35-36). She recalls having extra catheters supplied to Plaintiff (*Id.* at 36).

Plaintiff indicated that he had no questions for Defendant Brown because he was receiving all of the catheters and diapers he needed (*Id.* at 37). As to the shower chair, he stated that he was able to get by with it (*Id.* at 37-38). Plaintiff unequivocally stated, "everything with the showers, the catheters, and the diapers, that's okay now." (*Id.* at 38). However, Plaintiff had yet to receive the sterile gloves he requested (*Id.* at 38).

Brown stated that she was unaware of Plaintiff's request for gloves, but she did know that certain inmates use gloves to manually evacuate their bowels (*Id.* at 39-40). At the end of Brown's testimony, she and Plaintiff agreed that he would be able to get gloves as needed (*Id.* at 42).

Plaintiff also testified that he "figured out a way to maintain without [the bed rail] where [he] can still remain safe, so it doesn't make sense to waste the Court's time on issues that are already worked out" (*Id.* at 50-51).

Dr. Alberto Butalid testified about his practice at Pinckneyville (*Id.* at 52). He has seen Plaintiff on two occasions (*Id.* at 55). Dr. Butalid stated that Plaintiff was on Dilantin and Lamictal to manage long term chronic conditions, specifically seizures (*Id.* at 55). He was also on Tramadol and Neurontin for acute short-term care (*Id.* at 55-56). Butalid is familiar with Tramadol as a pain medication, and Neurontin for neuropathic

pain (*Id.*). Butalid first saw Plaintiff on March 29, 2018, after an issue arose about a bag of Tramadol and Neurontin located in a cell Plaintiff recently vacated (*Id.* at 56-57). Dr. Butalid informed Plaintiff that the bag was found and told him he no longer needed those medications if he was not ingesting them (*Id.* at 57-58). By contrast, Dilantin and Lamictal were not discontinued (*Id.*). However, Dr. Butalid later saw Plaintiff because Plaintiff reportedly was not taking his seizure medications (*Id.* at 58-59).

Dr. Butalid was aware that Plaintiff had diabetes (*Id.* at 59). A blood test result showed that Plaintiff's hemoglobin a1c was a 6.7—above the 6.5 that indicates someone is diabetic (*Id.* at 60). Dr. Butalid considers anything below a 7 acceptable (*Id.* at 60-61). Medication can be prescribed, but Dr. Butalid opined that Plaintiff's blood sugar levels over time did not require medication (*Id.*). Records reflect that Plaintiff's blood sugar was checked three times a week in or around February 2018 (*Id.* at 61-62). Dr. Butalid said he would prescribe medication if necessary (*Id.*). Dr. Butalid further explained that Plaintiff was on the chronic diabetic clinic where his blood sugar was monitored, and he received advice about appropriate dietary choices, etc. (*Id.* at 62-63). A clinic member could have prescribed medication as needed (*Id.*). Butalid also noted that a May 15, 2018 blood test showed low Dilantin levels (*Id.* at 63-64).

On cross-examination, Plaintiff asked Dr. Butalid about why he took Neurontin (*Id.* at 65-66). Dr. Butalid said it was for paraplegic pain management (*Id.* at 65). Dr. Butalid did not recall a conversation about when or how long Plaintiff took Lamictal (*Id.*

at 65-66). Dr. Butalid stated that Plaintiff's hemoglobin a1c level was taken on April 30, 2018, but Plaintiff insisted that he refused labs on that day (*Id.* at 66-67). According to Dr. Butalid, bloodwork is automatically taken every four months from individuals on the diabetic clinic (*Id.* at 71-72). As to his seizure medication, a May 13, 2018 note indicates that Plaintiff was seen because he was refusing to take Lamictal (*Id.* at 76-77). Plaintiff was informed of the importance of taking his prescribed medications (*Id.* at 76-77).

During Plaintiff's own testimony, he directed the Court to review his handwritten personal calendar (*Id.* at 91-92). The April 30, 2018 entry stated, "labs refused" (*Id.* at 92). An exhibit of medical records for April 30, 2018, indicates labs were "unknown" (*Id.* at 93-94). The same record bears the name Dr. Michael Scott, an individual who was no longer employed at Pinckneyville in April 2018 (*Id.* at 94-95). Magistrate Judge Williams indicated that the record said, "unknown time" not "unknown record," so he would not credit the interpretation that no lab was drawn (*Id.* at 94). Plaintiff also contended that an entry for May 15, 2018, was inaccurate about when labs were taken or who they were taken by (*Id.* at 95-96). Plaintiff insisted that his levels were never checked in April 2018, that he was not getting appropriate treatment for his seizures, that he was not hoarding medications, and that he ate only once a day to self-manage his diabetes (*Id.* at 96-100). Based on these situations, he indicated he needed care for his seizures and diabetes (*Id.*). He stated that at some point he had a

seizure and did not receive appropriate labs to respond to the issue (*Id.* at 100-102). Plaintiff also insisted that he made his refusal known to Holton (*Id.* at 108). Magistrate Judge Williams asked counsel for the Defendants to look into Holton (*Id.*).

After the two evidentiary hearings, Defendants submitted a short reply brief providing follow-up information to the hearings (Doc. 93). They indicated that Plaintiff would begin receiving six pairs of protective gloves per week (*Id.* at 1-2). As to the request for video footage of the medical area from April 30, 2018, they indicate such footage is non-existent (*Id.* at 2). As to Holton, they indicated that he does not recall witnessing Plaintiff refuse labs on April 30, 2018 (*Id.*). The statements about video footage and Holton were supported by sworn declarations (*Id.* at 93-1, 93-2). Based on these representations, the evidence presented at the hearings, and the record at large, Defendants sought denial of the request for a preliminary injunction (*Id.* at 3).

Before the Court could issue the R&R Plaintiff filed a second request for injunctive relief wherein he indicated that circumstances had changed (Doc. 97). Specifically, he indicated he could no longer tolerate a bed without rails (*Id.* at 1-2). He also indicated that the issue of gloves had not been addressed on July 21, 2018, and he did not receive a shower pass he was supposed to receive, so he was sitting in a soiled state (*Id.*). Plaintiff appended a single page declaration stating his issues, as well as medical records (*Id.* at 4-9).

Magistrate Judge Williams issued a 20-page R&R analyzing the requests for injunctive relief (Doc. 98). He surmised that injunctive relief was not appropriate at this juncture because Pinckneyville either had accommodated Plaintiffs needs, or as to the medication issues, the record and evidence did not conclusively establish that medications were being withheld in an improper manner. Magistrate Judge Williams

indicated that after the evidentiary hearings and supplemental filings, the only issues left for consideration were whether Plaintiff was improperly denied his seizure or diabetes medications (*Id.* at 13-14). As to his diabetes medication, Magistrate Judge Williams concluded that Plaintiff could not establish a likelihood of success on this claim because his blood sugar levels were being monitored, and Dr. Butalid credibly testified that the levels were not at a level unequivocally requiring treatment by medication (*Id.* at 15-16). Plaintiff's disagreement with this approach is of little impact because prisoners are not entitled to medical care of their choosing (*Id.*). As to the disagreement about whether or not Plaintiff's blood was tested on April 30, Magistrate Judge Williams concluded that the records indicate the labs were taken on that date, but the processing may have been delayed (*Id.* at 16-17). In reaching this conclusion, Magistrate Judge Williams discredited Plaintiff's statements that the lab results were falsified, or his calendar shows he refused labs (*Id.*). Thus, he concluded that the evidence did not warrant injunctive relief for diabetes medication (*Id.* at 18).

As to the seizure medications, Magistrate Judge Williams concluded that Plaintiff was still being prescribed Lamictal and Dilantin—medications that Dr. Butalid testified treat seizures (*Id.* at 18-19). Plaintiff's own refusal to take certain medications, or his decision to hoard others has no impact on the reasonableness of Dr. Butalid's chosen course of treatment (*Id.*). Accordingly, Magistrate Judge Williams recommends denying injunctive relief for seizure medications (*Id.* at 19).

Plaintiff filed objections to the R&R contesting the bed rail issue, the shower accommodation, and the administration of diabetes and seizure medications (Doc. 100). As to the bed rail issue, he stated that he declined to raise it at the second evidentiary hearing because the Court was biased against him and he did not want to go through it (*Id.* at 2-3). As to the shower, he indicated that after the second evidentiary hearing, he was not receiving showers at appropriate times (*Id.* at 1-2). At a doctor's appointment after the evidentiary hearings, a doctor allegedly refused to review his diabetes or seizure medications (*Id.* at 2-3). Plaintiff repeatedly contends that medical records about his labs in the spring of 2018 are falsified (*Id.* at 3-6). He insists that the only way to clarify the issue is to contact University of Illinois—where the labs were purportedly sent for processing (*Id.*). Ultimately, Plaintiff requests that the Court grant injunctive relief in relation to his bed, shower, and medications, and order records to be clarified about his spring 2018 labs (*Id.* at 6).

He appended medical charts and a page of lab results from spring 2018 (*Id.* at 7-11). He also appended a request to subpoena records from University of Illinois, as well as his handwritten calendar of April 2018 (*Id.* at 12-14).

Additionally, Plaintiff filed a second supplemental objection (Doc. 104). The second objection rehashed his contention that his medical records were falsified regarding the April 30, 2018 (*Id.* at 1-2, 12). Plaintiff again urged the Court to issue a subpoena for original records (*Id.*). In support of his contentions, Plaintiff appended

medical records and various other documents concerning his incarceration (*Id.* at 3-11, 13-19).

Most recently, Plaintiff filed a Second Request for a Preliminary Injunction (Doc. 112). He contends that since the preliminary injunction evidentiary hearings, he has been placed in cell locations with no access to showers (*Id.* at 2-3). Additionally, he contends that his diabetic symptoms are worsening with no change in treatment (*Id.* at 3-4). In response to these issues he repeatedly seeks his medical records to prove that he had no blood draw on April 30, and that his diabetic care is inadequate (*Id.* at 4). He also seeks an accessible cell and/or access to showers (*Id.*). He appends an affidavit recounting the issues with his medical records (*Id.* at 4-5), as well as many documents concerning his medical records (*Id.* at 7-20). Additionally, he incorporates a new issue about his personal safety—alleging that he is not being kept in appropriate protective custody based upon his cooperation against certain incarcerated individuals (*Id.* at 5, 21-25).

## III. Applicable Law

Timely objections having been filed, the Court undertakes *de novo* review of the portions to the Report to which Plaintiff specifically objected. **28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72(b); SDIL-LR 73.1(b).** The undersigned can accept, reject, or modify Magistrate Judge Williams' recommendations, receive further evidence, or recommit the matter with instructions. *Id.* As the review of the motion for preliminary injunction

is *de novo*, the Court conducts an "independent review of the evidence and arguments without giving any presumptive weight to the magistrate judge's conclusion," and "is free, and encouraged, to consider all of the available information about the case when making this independent decision." *Mendez v. Republic Bank*, **725 F.3d 651, 661 (7th Cir. 2013).**

A preliminary injunction is "an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, **520 U.S. 968, 972 (1997) (emphasis in original).** *Accord Winter v. Natural Res. Def. Council, Inc.*, **555 U.S. 7, 24 (2008) ("A preliminary injunction is an extraordinary remedy never awarded as of right") (citation omitted).** To secure a preliminary injunction, the movant must show (1) that he is likely to succeed on the merits, (2) that he is likely to suffer irreparable harm without the injunction, (3) that the harm he would suffer is greater than the harm a preliminary injunction would inflict on defendants, and (4) that the injunction is in the public interest. *Judge v. Quinn*, **612 F.3d 537, 546 (7th Cir. 2010) (citing *Winter*, 555 U.S. at 20).** The "considerations are interdependent: the greater the likelihood of success on the merits, the less net harm the injunction must prevent in order for preliminary relief to be warranted." *Judge*, **612 F.3d at 546. (citation omitted).**

In the context of prisoner litigation, there are further restrictions on the Court's remedial power. The scope of the court's authority to enter an injunction in the

corrections context is circumscribed by the Prison Litigation Reform Act (PLRA). *Westefer v. Neal*, 682 F.3d 679, 683 (7th Cir. 2012). Under the PLRA, preliminary injunction relief "must be narrowly drawn, extend no further than necessary to correct the harm the court finds requires preliminary relief, and be the least intrusive means necessary to correct that harm." 18 U.S.C. § 3626(a)(2). *See also Westefer*, 682 F.3d at 683 ("[T]he PLRA enforces a point repeatedly made by the Supreme Court in cases challenging prison conditions: prison officials have broad administrative and discretionary authority over the institutions they manage.") (internal quotation marks and citation omitted).

The Seventh Circuit has described injunctions like the one sought here, where an injunction would require an affirmative act by the defendant, as a mandatory preliminary injunction. *Graham v. Med. Mut. of Ohio*, 130 F.3d 293, 295 (7th Cir. 1997). Mandatory injunctions are "cautiously viewed and sparingly issued," since they require the court to command a defendant to take a particular action. *Id.* (*citing Jordan v. Wolke*, 593 F.2d 772, 774 (7th Cir. 1978); and *W.A. Mack, Inc. v. Gen. Motors Corp.*, 260 F.2d 886, 890 (7th Cir. 1958)).

IV. Analysis

The Court does not deny that Plaintiff's medical conditions warrant specialized treatment as well as accessible amenities. However, the facts in evidence strongly suggest that Pinckneyville Defendants are taking necessary measures to maintain

Plaintiff's health while he is incarcerated. As to the catheter, diaper, and sterile glove issues—the parties were able to resolve these issues between the first and second evidentiary hearings. At that time, the parties also agreed that the shower and bed rail issues had been sufficiently resolved. Now before the Court, Plaintiff complains that the shower, the bed, his medications, and his status in protective custody are all issues. The Court will address each request for injunctive relief in turn.

First, as to the contention that shower facilities are inadequate. Plaintiff contends in his first objection to the R&R that he has access to showers 3 days a week from 3-11p.m.. This repeats a part of his initial grievances about showers—that he did not get to shower as frequently as he wanted. However, in Plaintiff's Second Request for Preliminary Injunction (Doc. 112), Plaintiff contends that he no longer has any access to showers, in contrast to any of his earlier filings. The Court finds this allegation implausible considering the record evidence before it. Pinckneyville officials appear responsive and sympathetic to Plaintiff's need for regular showers. For example, when Defendant Brown learned that Plaintiff needed a different shower chair, she had one sent over expeditiously. Additionally, Plaintiff alleged that a doctor ordered him to receive more frequent showers, or showers at a time convenient to him (Doc. 100 at 1-2, Doc. 112).

The facts in the record about access to showers suggest that Pinckneyville officials are giving appropriate access to shower facilities. It does not make sense that

officials or staff at Pinckneyville would suddenly begin treating Plaintiff's need to shower drastically differently after two evidentiary hearings on the matter and before an R&R was even issued.  Plaintiff's change of tune appears to be a part of a larger growing dissatisfaction with either the litigation process or his placement at Pinckneyville.  Out of an abundance of caution, the Court will direct Pinckneyville Defendants to submit a supplemental affidavit clarifying Plaintiff's access to showers at this juncture.  If Defendants aver that showers are available, the preliminary injunction will be denied as to showers.

Second, as to Plaintiff's contention that his bed is no longer adequate without handrails, the Court is also unmoved by this argument.  Magistrate Judge Williams made no recommendation on this front because he accepted the issue to be resolved after Plaintiff verbally stated at the second evidentiary hearing that he had figured out how to work with the bed he had.  Plaintiff circles back in his objections and indicates that he did not pursue the bed issue at the hearing because he was tired of a prejudiced court.  This excuse does not prove that the bed is a serious safety issue for him, nor is it credible.  The transcript of the evidentiary hearings reveal that the other parties and the Court were abundantly respectful to Plaintiff, collaborating to make quick work of the accommodations he sought.  For example, during the second evidentiary hearing, a witness (Defendant Brown) left the room to go and independently research Plaintiff's access to sterile gloves in his records at the health care unit.  The witness reported that

the records were inconclusive about his current medical status as to gloves, but the witness agreed to further investigate the matter within a week to make sure Plaintiff got what he needed.  The supplement by Defendants after the hearing avers that this was accomplished.  Plaintiff also received a new shower chair in short order.  These facts support the conclusion that Plaintiff may receive some type of bed accommodation if he requested it.  There is no proof that he has sought an accommodation directly from Pinckneyville yet.  Accordingly, the Court will not grant injunctive relief on this ground.

Third, as to Plaintiff's contention that his seizures and diabetes are not being appropriately treated, the Court also finds that there is no need to grant relief on this basis.  As to the diabetes medication, much of the record is consumed debating whether there was blood testing on April 30, 2018.  However, this narrow focus overlooks the undisputed fact that Plaintiff is on diabetic clinic where he receives periodic information about how to manage his condition as well screenings of his symptoms.  If his symptoms have recently increased in severity, the appropriate remedy is first to seek help via the prison health care unit prior to seeking injunctive relief.  The information in the record following the evidentiary hearings credibly shows that his diabetes was not at a level of severity that posed a serious threat of irreparable harm, and it was being monitored via the clinic.  Accordingly, injunctive relief is not appropriate on this basis.

Turning to the seizure medication, the record demonstrates that Dr. Butalid believes Plaintiff should ingest Dilantin and Lamictal to manage his seizures. As to Neurontin and Tramadol, Dr. Butalid opined that those medications were for pain management associated with paraplegia. Dr. Butalid credibly testified that those medications were discontinued because Plaintiff was found to be hoarding them in his cell. Rather than contend that he suffers from undue pain and needs the medications, Plaintiff attempts to insist that at least one of the two is useful for seizure management. Without the medication, Plaintiff alleges that he is suffering frequent seizures. Frequent seizures due to a total lack of medication could provide a basis for injunctive relief. However, Dr. Butalid is the one with medical knowledge, not Plaintiff. Dr. Butalid credibly testified that Plaintiff was receiving two medications to manage his seizures. This appears sufficient to treat the situation.

If it is not sufficient, Plaintiff has not submitted any significant evidence documenting the increased number of seizures he is allegedly experiencing due to inappropriate medications. Dr. Butalid said that he was unaware of frequent seizures and had not witnessed one. What is more, if Plaintiff was hoarding medications rather than taking them, then he should have been having regular seizures all along. This discredits Plaintiff's assertion that he needs a combination of the discontinued medications and the present ones to manage his seizures. The medical records also do not reflect that Plaintiff was suffering from frequent seizures, even though the medical

charts appear quite thorough. Based on the bulk of the available evidence, the Court cannot conclude that Plaintiff is in imminent danger of irreparable harm without different medications for his seizures.

Finally, in Plaintiff's most recent request for injunctive relief, he seeks placement in protective custody. The Court will not address the merits of this request in this order on the R&R from Magistrate Judge Williams because he did not consider this issue in the first instance. If Plaintiff feels that he is in continual danger, he will need to file a separate request for injunctive relief that does not co-mingle old issues with this new one. Injunctive relief is denied as to protective custody.

## V.     Conclusion

For the reasons set forth above, the Court **ADOPTS** the Report and Recommendations (Doc. 98) over Plaintiff's objections (Docs. 100, 104, 112) on all grounds other than the shower issue. As to the showers, the Defendants are **DIRECTED** to supply the Court with a supplemental affidavit about Plaintiff's opportunity to use an accessible shower within **14 days**. Upon receipt of the affidavit, the Court will rule on the remaining issue.

**IT IS SO ORDERED.**

DATED: September 24, 2018

*s/ Michael J. Reagan*
Michael J. Reagan, Chief Judge
United States District Court